IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SAMUD IMAI,<br><br>        Plaintiff,<br><br>    vs.<br><br>HALE KOA HOTEL; FRANCIS J.<br>HARVEY, Secretary, Department<br>of the Army,<br><br>        Defendants. | CIVIL NO. 04-00583 BMK<br><br>MEMORANDUM IN SUPPORT OF<br>DEFENDANTS' MOTION TO<br>DISMISS, AND/OR FOR SUMMARY<br>JUDGMENT |

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS, AND/OR FOR SUMMARY JUDGMENT

I.  <u>INTRODUCTION</u>

Any claims occurring outside of the forty-five day period prior to December 12, 2000 must be dismissed because Plaintiff failed to exhaust her administrative remedies when she failed to consult with an EEO counselor within forty-five days of the alleged discriminatory event.

Plaintiff's Title VII claim arising out of her job grade must be dismissed because she was not similarly situated to the male employees whom she claimed received preferential treatment because the male employees were able and willing to operate the heavy equipment to obtain a higher work grade.

Plaintiff's Title VII claim arising out of her termination must be dismissed because Defendants set forth legitimate, non-discriminatory reasons for Plaintiff's termination - an abuse of trust arising out of her theft of the hotel master key.

Plaintiff will not be able to establish pretext as the decision to terminate Plaintiff was based on recommendations formulated after detailed investigations and the managers making the decision to terminate Plaintiff honestly believed that Plaintiff stole the hotel master key.

Plaintiff's retaliation claim must be dismissed because the alleged harassment and the work injuries/lack of training claims occurred prior to the Plaintiff's initial December 12, 2000 protected EEO activity.  Plaintiff's retaliation claim as to the termination also must be dismissed because the eighteen-month gap between the December 12, 2000 protected EEO activity and the March 2003 termination clearly establishes the absence of any causal nexus between the protected activity and the termination.

Plaintiff's hostile work environment claim must fail because she has failed to set forth any evidence of pervasive conduct that was made on account of her race, national origin, sex or prior protected activity.  Plaintiff has also failed to set forth any evidence that the Defendants' conduct altered the condition of her employment.  Rather, the alleged abusive conduct was simply constructive criticism given by Defendants in an attempt to improve Plaintiff's work performance.

II.   <u>STATEMENT OF FACTS</u>

   A.   <u>Plaintiff's Housekeeping Position</u>

   Plaintiff began working at the Hotel in 1989 and was assigned to the Swing/Night Shift, which lasts from 3:30 p.m. until 12:00 a.m.  <u>See</u> Transcript from August 22, 2002 Fact Finding Conference, a true and correct copy of which is attached hereto as Exhibit "A" at 9:25 to 10:7.  Plaintiff is of Thai descent and was born on December 7, 1950.  <u>See</u> Amended Complaint at paragraph 4.

   At the inception of the evening shift, all custodial employees (male and female) attend a meeting with the shift supervisor and are assigned their duties for the evening, which are detailed in a job sheet.  <u>See</u> Exhibit "A" at 27:22-29:5. Throughout the evening, depending upon the needs of the hotel or the number of rooms that are vacated by guests, the custodial workers will be asked to manage additional tasks, some of which are assigned a higher priority.  <u>Id.</u> at 131:5-131:23.  On Plaintiff's shifts, she was normally the only female working on the crew.  <u>Id.</u> at 109:13-109:17.

   Due to the variables in the operations in the Hotel, i.e., traffic in the lobby and number of the functions in the ballrooms, the employees did not perform the same duties in the same time frame every night.  <u>Id.</u> at 80:14-81:12.  Thus, the male and female employees on Plaintiff's shifts are given constant

3

instructions on the tasks to perform and when to perform these
tasks.  Id. at 78:21-80:4.

As the shift manager, Kathleen Hamlin ("Hamlin"), in
addition to making work assignments, monitors the custodial
employees to ensure that the daily duties are completed and will
occasionally assist the workers she supervises to complete all
cleaning assignments in a timely manner.  Id. at 109:13-109:17.

   B.   Plaintiff's Work Performance/Unfair Treatment Claims

        1.   Plaintiff's Performance Evaluations

Plaintiff's performance ratings were satisfactory from 1996-
2000 although her 1998, 1999 and 2000 evaluations indicated that
she needed to work faster.   See Work Performance documents, true
and correct copies of which are attached hereto as Exhibit "B".

On September 13, 2000, Charles Chai ("Chai") (who has since
expired), Plaintiff's then-shift supervisor, placed Plaintiff on
a Performance Improvement Plan because she was unfamiliar with
the chemicals that she was using and was in danger of injuring
herself, others or even damaging the hotel property.  See Exhibit
"A" at 270:18-275:1.

Hamlin succeeded Chai as Plaintiff's supervisor and noted,
with management concurrence, Plaintiff's inconsistent work
product as to the quality and quantity of her work product.  See
Exhibit "A" at 110:23-111:18, 239:23-240:4; 254:21-255:14 and see
transcript of February 13, 2004 Fact Finding Conference, a true

4

and correct copy of which is attached hereto as Exhibit "C" at
168:14-169:4.

In her supervisory position, Hamlin would correct any
worker, male or female, if they were not performing a duty
correctly.  See Exhibit "A" at 110:9-110:22.  Hamlin wanted to
help her employees "to do the best that they can do."  Id. at
113:18-113:25.  If the employees needed help, Hamlin would coach
them to reach the level of quality that the Hotel expects.  Id.

### 2.    Co-Worker Complaints Re: Plaintiff

One of Plaintiff's co-workers, Joseph Orejudos ("Orejudos"),
complained that they would often need to perform Plaintiff's job
duties when Plaintiff arrived at work late.  Id. at 185:12-
186:10.  After Orejudos made verbal complaints to Hamlin about
Plaintiff's tardiness, Orejudos placed his complaints in writing
at the request of Hamlin.  Id. at 181:8-183:10.

### 3.    Other Hotel Employees Complaints Re: Hamlin

Other employees have made complaints about Hamlin's
management style.  For example, male co-workers have complained
that Hamlin was tough and gave them too much work to complete.
Id. at 231:5-231:8.  Other male employees have reported that
Hamlin would counsel them regarding their work product at the
spot of the infraction and would sometime appear "mad" or scold
them if the task was not completed to her liking, often in the
presence of other employees.  Id. at 150:21-150:25; 155:9-156:2;

176:15-176:25; 178:7-178:11.  Hamlin would routinely tell male employees, in addition to Plaintiff, what tasks to do and when to do it.  Id. at 128:19-129:5.

### 4.  Lee's Investigation of Plaintiff's Claims

In December 2000, the Director of Rooms at the Hotel, John Lee ("Lee"), conducted an informal investigation into Plaintiff's allegations that Ms. Hamlin was unfairly monitoring her and that she was forced to work harder then her co-workers.  Id. at 125:21-126:7.  Lee's investigation included a review of the workers' worksheets and personal interviews of Plaintiff, Hamlin and Emily Lelis ("Lelis"), the Chief Supervisor in the Swing Shift.  Id. at 126:21-127:2; Exhibit "C" at 154:19-155:2.  Lee also may have spoken to Pauline Souza ("Souza"), the Hotel's Assistant Executive of Housekeeping and Plaintiff's second level supervisor.  See Exhibit "A" at 126:21-127:2.

After conducting his investigation, Mr. Lee concluded that Plaintiff had a lighter work load in comparison to her male co-workers as she was not required to operate the heavy equipment. Id. at 127:19-128:2.  Based on his observations, Lee also noted that Hamlin was consistent in giving instructions and using the same tone of voice when speaking with male and female Hotel employees.  Id. at 128:14-129:12.

6

C.    Theft Of Hotel Master Key

1.    Events of January 5, 2003

Plaintiff was scheduled to work her regular night shift, on January 5, 2003 from 3:30 p.m. to midnight.  See Exhibit "C" at 21:6-21:14.  During the evening on January 5, 2003, Plaintiff assisted Hamlin, Lelis, and Simeon Manginsay ("Manginsay) in cleaning the food and beverage office group.  Id. at 22:2-23:2; 113:13-114:9.

Hamlin used the #2 master key (which is connected to the red lanyard and did not contain a loop) to open the food and beverage offices and then accidentally left the #2 master key in the doorknob.  Id. at 113:15-113:24; see photograph of #2 master key, a true and correct copy of which is attached hereto as Exhibit "D".  The #2 master key is significant because it can unlock all of the guest rooms in the Maile Tower, as well as the executive offices.  See Exhibit "C" at 66:1-66:20.

After Hamlin opened the door to the banquet setup office, Lelis and Manginsay went on break.  Id. at 114:2-114:9.  Upon returning from his break, Manginsay returned the #41 key (which could be used to open the office doors in the Hotel and was attached to a green lanyard) to Hamlin.  Id. at 114:2-115:2 and photograph of #41 key, a true and correct copy of which is attached hereto as Exhibit "D".  Hamlin then gave #41 key to Plaintiff (in case she needed to open the office) and told her

7

that after she finished vacuuming the hallway, she could take her break.  See Exhibit "C" at 114:23-115:2; 115:18-115:24. Plaintiff was the last custodial worker to leave the food and beverage office area. Id. at 23:12-23:23; 123:15-123:23.

At approximately 10:30 p.m., Hamlin and Lelis realized that they did not have the #2 master key and they went to the clerk's office to retrieve #41 key because it was the only other key besides the #2 master key that would open the door to the food and beverage office.  Id. at 116:3-116:15; 157:10-159:11.  Hamlin and Lelis used the #41 key to enter the food and beverage office and others offices in their unsuccessful attempt to locate the #2 master key.  Id. at 116:11-116:24; 159:12-159:17.

Plaintiff's testimony as to the location of key #41 was contradicted by her actions.  During an administrative proceeding, Plaintiff  testified that she turned in key #41 to the clerk when her shift ended at midnight.  Id. at 46:1-46:15. Plaintiff also claimed that after leaving the food and beverage office, she cleaned the travel office, which would require her to possess the #41 or #2 key to enter these offices.  Id. at 75:18-77:14.

During their search for the #2 master key, both Hamlin and Lelis testified that they asked Plaintiff if she possessed the master #2 key and Plaintiff answered in the negative.  Id. at 119:6-119:15; 161:10-161:19.

8

On January 6, 2003, Mr. Leandro Abbago ("Abaggo"), a custodial worker, discovered the missing #2 master key in the compactor dumpster for the Maile Tower after operating the compactor on the dumpster. See deposition of Leandro Abaggo, a true and correct copy of which is attached hereto as Exhibit "E" at 10:24-15:11.

2.   Investigation by Winnie Nemoto

In the early morning of January 6, 2003, at approximately 2:30 a.m., Winnie Nemoto ("Nemoto"), the Housekeeping Services Manager, was called at home by the assistant manager at the Hotel, to report that the #2 master key was missing. See Exhibit "C" at 66:21-67:9.  On January 6, 2003, Nemoto interviewed Hamlin regarding her knowledge about the missing #2 master key and also interviewed Lelis several days later. Id. at 68:11-68:25. Nemoto also reviewed a statement made by Abaggo. Id. at 69:11-70:13.  On January 6, 2003, Nemoto reviewed the CCTV videotape of Plaintiff walking in the Maile tunnel which revealed that she was carrying a lanyard in her hand. Id. at 72:12-72:23 and see still photographs of the CCTV video, true and correct copies of which are attached hereto as Exhibit "F" and a copy of the CCTV tape, a true and correct copy of which is attached hereto as Exhibit "G".

On January 15, 2003, Nemoto met with Plaintiff to discuss the discovery of the #2 master key in the basement compactor dumpster under the Maile Tower. See Exhibit "C" at 73:4-73:14.

9

Plaintiff informed Nemoto that she took a bag of rubbish to the
Maile loading dock, where she threw it into the compacter and
then proceeded to the front desk.  <u>Id.</u> at 73:15-74:24.      In
describing her route of travel, Plaintiff explained that she
"went to the Ilima loading dock, across the Ilima loading dock,
down the Maile tunnel, which is . . the furthest away from the .
. . front desk...to the compactor, threw her rubbish . . . [c]ame
back up the Maile elevator, walked back across the Maile lobby to
the front desk to clean the front desk."  <u>Id.</u>

     In conducting her investigation, Nemoto questioned the route
taken by Plaintiff.  More specifically, if Plaintiff was in a
rush as she indicated, the fastest way to the front desk was to
use the elevator near Nemoto's office, which is at ground level
of the Ilima Tower, up to the lobby level, and walk across the
Ilima lobby to the front desk.  <u>Id.</u> at 74:2-74:24.

     Nemoto also questioned how Plaintiff was able to enter the
travel office on January 5, 2003 without having the #2 master key
after she emptied the rubbish in the Maile compactor dumpster,
because Hamlin and Lelis had taken key #41 to retrace their steps
in search of the missing #2 master key.  <u>Id.</u> at 75:18-77:14.
Nemoto also opined that no one other than Plaintiff throws
rubbish into the compactor during the 11:40 p.m. to 12:00 a.m.
time frame.  <u>Id.</u> at 80:1-80:14.  During her January 15, 2003
meeting with Plaintiff, Plaintiff denied that she possessed the

                              10

#2 master key and that she was only carrying rubbish when she left the women's locker room.  Id. at 79:17-79:22.

Nemoto proposed termination because she believed that, based on her review of the videotape and her interviews with Ms. Hamlin, Ms. Lelis, and Plaintiff, that there was an intentional and dishonest act committed in possessing and removing the #2 master key.  Id. at 80:24-82:25.  Nemoto did not consider Plaintiff's race, color, national origin, gender or age or the existence of prior EEO complaints when formulating her recommendation.  Id. at 83:7-84:6.

Nemoto made the decision to suspend Hamlin and Lelis from work without pay for one day for failing to follow procedures relating to possession of the #2 master key.  Id. at 88:19-89:2. In differentiating the suspension of Lelis and Hamlin and Plaintiff's termination, Nemoto considered the following factors: 1) Hamlin and Lelis informing Hotel management that the key was missing, 2) their cooperation with management in describing the events of January 5, 2003, 3) their efforts in looking for the key and 4) their admission that they failed to comply with the hotel's procedures in handling the #2 master key.  Id. at 88:5-88:18.

### 3.   Investigation By John Lee

Lee reviewed the color CCTV tape and drew his own conclusion, without interpretation from others, that Plaintiff

was carrying a red lanyard in her hand.  See Exhibit "H" at
238:5-239:4.  With regard to Plaintiff's claim that she was
carrying the #41 key on the green lanyard in the CCTV tape, Lee
noted that Plaintiff could not have been holding the green #41
key in her hand, because Hamlin and Lelis possessed the #41 key
as they retraced their steps when they tried to locate the
missing #2 master key.  Id. at 239:21-240:14.

    In making his determination to terminate Plaintiff, Lee
noted that he considered the severity of the offense, i.e., the
#2 master key falling into the wrong hands jeopardizing the well-
being and security of every guest in the hotel.  Id. at 240:20-
241:12.  In differentiating the suspension of Ms. Hamlin and Ms.
Lelis from Plaintiff's termination, Lee noted that the actions of
Lelis and Hamlin were a matter of negligence, while Plaintiff's
acts were malicious and intentional.  Id. at 244:21-245:12.  In
deciding to terminate Plaintiff, Lee did not consider Plaintiff's
race, national origin, color, gender or age or her prior EEO
activity.  Id. at 247:11-247:15; 248:2-248:5.

    D.    1997 Incidents Re: Clorox and Heavy Machinery

    In the Amended Complaint, Plaintiff alleges that on October
12, 1997, Plaintiff was ordered to clean a room that "reeked" of
Clorox which caused Plaintiff to seek medical care.  See Amended
Complaint at paragraph 13.  On October 19, 1997, Plaintiff
sustained a shoulder strain as a result of her being compelled to

12

use a large floor buffer without proper training.  Id. at
paragraph 15.  Plaintiff received Office of Workers' Compensation
Program Benefits arising out of these incidents.  Id. at
paragraphs 14 and 17.

Plaintiff claims that she was assigned a lower grade level
(NA-1) because she was unable to operate heavy machinery, which
would have resulted in her being upgraded to a grade 2 custodial
worker (NA-2).  Id. at paragraph 19 and see Exhibit "A" at
247:20-248:3.

Contrary to Plaintiff's claim, other females at the Hotel
are employed at the NA-2 level.  See Exhibit "A" at 248:7-249:2.
In fact, Plaintiff has testified that she was happy that she did
not have to do the heavy work required of the NA-02 level and
admitted that "I not the same level that the guys are."  Id. at
43:20-44:5.

III. PROCEDURAL HISTORY

A.    EEO Complaint #1

On December 12, 2000, Plaintiff made initial contact with an
EEO counselor regarding alleged gender discrimination, based upon
the alleged harassment that she received from her shift
supervisor.  See Amended Complaint at paragraph 46(a).

Plaintiff filed a formal EEO complaint ("EEO Complaint #1)
on March 29, 2001.  See EEO Complaint filed on March 29, 2001, a
true and correct copy of which is attached hereto as Exhibit "I".

13

In EEO Complaint #1, Plaintiff made a gender discrimination claim arising out of that Hamlin alleged harassment of her.  Id.

    B.   EEO Complaint #2

    Plaintiff initiated contact with an EEO counselor on April 11, 2003.  See EEO Counseling Certification Notice dated April 11, 2003, a true and correct copy of which is attached hereto as Exhibit "J".  On or about May 27, 2003, Plaintiff filed an EEO Complaint ("EEO Complaint #2).  See May 27, 2003 Formal Complaint of Discrimination, a true and correct copy of which is attached hereto as Exhibit "K".  EEO Complaint #2 raises claims of discrimination based on race, color, national origin, handicap and sex and reprisal arising out of the following events: (1) her termination on March 11, 2003; (2) denial of training and work assignments to work heavy equipment; (3) injures sustained for using a floor buffer and exposure to toxic fumes; and (4) a hostile work environment since mid-2001.  Id.

IV.  ARGUMENT

    A.   Legal Standards

        1.  Motion to Dismiss

    A court must dismiss a case for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because subject matter jurisdiction is fundamental and cannot be waived.  The party seeking to invoke the jurisdiction of the court has the burden of establishing that jurisdiction exists.  Scott v.

14

Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  A court must dismiss an action whenever it appears that the court lacks jurisdiction.  Billingsley v. C.I.R., 868 F.2d 1081, 1085 (9th Cir. 1989).

     2.   Motion For Summary Judgment

     Summary judgment is properly granted when the district court, viewing the facts in the light most favorable to the nonmoving party, finds that there are no genuine issues of material fact and that the moving party is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).  One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial.  Celotex, 477 U.S. at 322.  A failure of proof regarding an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[1]  See id. at 322-23.

_____

     [1]  The moving party has no burden to negate or disprove matters on which the non-moving party will bear the burden of proof at trial.  The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case.  See id. at 325.

"If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." T.W. Elec. Serv., 809 F.2d at 630 (citations omitted). Rather, Rule 56(e) requires that the non-moving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. Id. To satisfy this burden, the non-moving party must produce at least some "significant probative evidence tending to support the complaint," and the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." United States ex rel. Anderson v. Northern Telecom, Inc., 52 F.3d 810, 815 (9th Cir.) cert. denied, 516 U.S. 1043 (1996) (quoting Anderson, 477 U.S. at 252).

16

B.    This Court Lacks Subject Matter Jurisdiction Over
      Plaintiff's Claims Regarding Her Work Injuries And Her
      Lower Work Grade In Relation To Male Co-Workers

It is well settled that a federal employee must exhaust all
available administrative remedies before filing an employment
discrimination complaint in the district court.  Brown v. General
Services Administration, 425 U.S. 820, 832 (1976); Vasquez v.
County of Los Angeles, 349 F.3d 634, 644-6 (9th Cir. 2004).

In order to properly exhaust all administrative remedies, a
federal employee must initiate contact with an EEO counselor
within 45 days from the alleged discriminatory act.  29 C.F.R. §
1614.105(a)(1).  The Ninth Circuit has held that a federal
employee's failure to consult with an EEO counselor within the
required 45-day time period after the alleged act of
discrimination is grounds for dismissing the employee's Title VII
claim filed in federal court.  See Cherosky v. Henderson, 330
F.3d 1243, 1245 (9th Cir. 2003); Leorna v. United States Dep't of
State, 105 F.3d 548, 550 (9th Cir. 1996).

In this case, Plaintiff's allegations regarding being
"ordered" to clean a room full of Clorox fumes on October 12,
1997 and straining her shoulder by operating a floor buffer on
October 19, 1997 were not timely because Plaintiff exceeded the
45-day time period to contact and raise these issues with an EEO
counselor.  Plaintiff did not make her initial contact with an
EEO counselor until December 12, 2000.  See Amended Complaint at

17

46(a).  For theses reasons, this Court should dismiss any
disparate treatment claims predicated upon the above-referenced
incidents.

      C.    The Defendant is Entitled to Summary Judgment on
            Plaintiff's Disparate Treatment Claims

      To assert claims of disparate treatment under Title VII,
Plaintiff must first establish a prima facie case of
discrimination by showing: (1) she belongs to a protected class;
(2) she was performing according to his employer's legitimate
expectations; (3) she suffered an adverse employment action; and
(4) other employees with qualifications similar to her own were
treated more favorably.  See Villiarimo v. Aloha Island Air,
Inc., 281 F.3d 1054, 1062 (9th Cir. 2002); Godwin v. Hunt Wesson,
Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (citing McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973)).

      Assuming that plaintiff could establish a prima facie case
of discrimination, McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973) requires the employer to produce evidence of a legitimate
nondiscriminatory reason for the action.  The burden on the
employer is one of production rather than proof or persuasion.
Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254
(1981) ("The defendant need not persuade the court that it was
actually motivated by the proffered reasons").

      If the employer meets this burden, the presumption of
unlawful discrimination "simply drops out of the picture."  St.

18

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).  The
plaintiff then must produce sufficient evidence to raise a
genuine issue of material fact as to whether the employer's
proffered nondiscriminatory reason is merely a pretext for
discrimination.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282
(9th Cir. 2000).  Pretext can be established by a showing that
the legitimate non-discriminatory reasons were unworthy of belief
(1) by direct evidence if it proves the fact of discriminatory
animus without inference or (2) by specific and substantial
indirect circumstantial evidence.  Villiarimo, 281 F.3d at 1063.
In examining an employer's justification of an adverse action, it
is not important as to whether the proffered were objectively
false but rather the employer honestly believed its reason for
the adverse action.  Id.

> 1.  Plaintiff's Disparate Treatment Claims Arising
>     Of Her Termination Must Be Dismissed

Plaintiff has failed to establish a prima facie case of
discrimination based on her race, national origin and sex
regarding her termination as there is no evidence that the
termination was motivated by Plaintiff's race, national origin
and sex.  As noted above, both the proposing and deciding
officials, Nemoto and Lee, testified that they did not consider
Plaintiff's race, national origin or sex when recommending and
deciding termination.  See Exhibit "H" at 247:11-247:15; Exhibit
"C" at 83:7-84:6.  Further, there was no evidence of any

similarly situated employees who received favorable treatment. In this case, Hamlin and Lelis both self-reported their errors and their failure to follow procedures were rooted more in negligence versus intentional acts of deception.

Even assuming, _arguendo_, that Plaintiff established a prima facie case of discrimination, Defendants have set forth legitimate, non-discriminatory reasons for her dismissal. The proposing and deciding officials, Nemoto and Lee, respectively, both conducted detailed investigations of the matter and determined that Plaintiff committed a violation of trust which justified termination.

More specifically, Nemoto considered the following facts: 1) Plaintiff was the last person to leave the food and beverage office where the master #2 key was left hanging, 2) Plaintiff needed the master #2 key to enter the travel office because Lelis and Hamlin possessed the #41 key as they retraced their steps in their search for the #2 master key, 3) the videotape revealed that Plaintiff was carrying a red lanyard as she walked toward the trash compactor, 4) Plaintiff admitted that she threw a bag of rubbish into the trash compactor shortly before midnight on January 5, 2003 and 5) the master #2 key was recovered from the trash compactor during the morning of June 6, 2003. See Exhibit "C" at 72:3-72:23; 75:18-77:14; 80:1-80:14.

Lee also conducted his own investigation in concluding that Plaintiff should be terminated.  Lee testified that he reviewed the color CCTV tape that showed the red lanyard #2 master key in Plaintiff's hand and statements made by Hamlin and Lelis.  <u>See</u> Exhibit "H" at 238:5-239:4.  Similar to Nemoto, Lee concluded that Plaintiff could not have possessed the #41 key because Hamlin and Lelis were using it to retrace their steps in an attempt to find the #2 master key.  <u>Id.</u> at 239:21-240:14.  Lee decided that termination was appropriate based upon the severity of the offense and the intentional nature of Plaintiff's act. <u>Id.</u> at 240:20-241:12.

Since both Nemoto and Lee conducted detailed investigations to come to their respective conclusions, the decision to terminate Plaintiff was based on legitimate, non-discriminatory reasons.  As such, Plaintiff cannot point to any evidence to establish evidence to establish that the above-referenced non-discriminatory reasons for her termination were pretext.

 2. Plaintiff's Disparate Treatment Claim Arising Out
 Of Her Work Grade Must Be Dismissed

Plaintiff has failed to establish a prima facie case of discrimination based on her race, national origin and sex and retaliation in relation to her claim that female employees were prohibited from "heavy" work and were precluded from receiving higher work grades (grade 2 custodial workers, NA-2, are allowed to use heavy machinery, while Grade 1 custodial workers, NA-1,

are not allowed to use heavy equipment).  See Amended Complaint
at paragraphs 18 and 19 and Exhibit "A" at 247:15-248:3.  These
claims have no merit.

First, Plaintiff cannot show that she was qualified or
capable of performing the duties associated with the heavy
equipment in order to be classified as an NA-02.  As noted above,
Plaintiff sustained a "serious strain to her shoulder" when she
used a large floor buffer in 1997.  See Amended Complaint at
paragraph 17.  Despite Plaintiff's allegations in the Amended
Complaint, it is questionable as to whether Plaintiff wants to
operate the heavy equipment.  During a prior hearing, Plaintiff
admitted that she was happy not to have to do the heavy work that
the men performed.  See Exhibit "A" at 43:20-44:2.

Second, Plaintiff was not similarly situated to the male NA-
02 custodial workers who she claims received preferential
treatment.  The male NA-2 workers were willing and able to
operate heavy machinery and they had different job descriptions.
Id. at 43:20-44:2 and 247:15-248:3.  In addition, other female
Hotel custodial workers were classified as the NA-02 level.  Id.
at 248:2-248:19.

Even assuming, arguendo, that Plaintiff established a prima
facie case of race, national origin and sex discrimination on the
training issue, legitimate, non-discriminatory reasons exist -
Plaintiff's prior shoulder injury and her unwillingness to

22

operate heavy equipment - to support Defendants' decision not to offer her training on the operation of heavy equipment.

D.  Plaintiff Cannot Establish a Prima Facie Case of Retaliation.

In order to establish a prima facie case of retaliation, a plaintiff must show: (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the two. Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).

To establish causation, a plaintiff must show that engaging in the protected activity was one of the reasons for his firing and that but for such activity, the plaintiff would not have fired. Villiarimo, 281 F.3d at 1064-1065. Timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression. Id. As with discrimination based on race, national origin or gender, the McDonnell Douglas Corp. burden shifting applies as noted in Section IV(A). Thus, if Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendants to establish legitimate, non-discriminatory reasons for the action. If the employer meets this burden, the plaintiff must set forth sufficient evidence on the issue of whether the proffered reason was pretext. McDonnell Douglas Corp., 411 U.S. 492; Coleman, 232 F.3d at 1282.

1.   Plaintiff Has Failed To Establish A Prima Facie
     Case Of Retaliation

     a.   Any Retaliation Claims Arising Out Of Events
          That Occurred Prior To December 12, 2000 Must
          Be Dismissed

The employer's awareness of the protected activity is
essential in establishing a causal link. Thomas v. City of
Beaverton, 379 F.3d 802, 812 n.4 (9th Cir. 2004) citing Yartzoff
v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987). When the
defendant is already upon a course of action adverse to Plaintiff
prior to learning of protected activity, there is no basis to
infer retaliatory intent. Miller v. Fairchild Indus., Inc., 797
F.2d 727, 731 n.1 (9th Cir. 1986) (citing Cohen v. Fred Meyer,
Inc., 686 F.2d 793m 796 (9th Cir. 1982).

In this case, it is undisputed that Plaintiff's initial
contact with an EEO counselor occurred on December 12, 2000. See
Amended Complaint at paragraph 46(a). Thus, it is also
undisputed that Defendants did not have any knowledge of prior
EEO activity as to any events that occurred prior to December 12,
2000. More specifically, in her Amended Complaint, Plaintiff
claimed that Hamlin "began to harass, demean, belittle, chastise,
and criticize" her work shortly after she stopped riding to work
with Plaintiff, three months after Hamlin being hired in 1996.
Id. at paragraphs 4, 10 and 12. Plaintiff further stated that in
October of 2000, "the selective harassment, accusations,
monitoring, intimidation, derogatory remarks and destructive

24

criticism by Hamlin became even worse..." Id. at paragraphs 6 and 21. Plaintiff also referenced work injuries that occurred in 1997 in the Amended Complaint. Id. at paragraph 13 to 17.

Plaintiff cannot show a casual nexus for events that occurred well before Plaintiff engaged in any protected activity and her retaliation claims arising out of these events must be dismissed.

b.    Plaintiff's Retaliation Claim Arising Out Her
      Termination Must Be Dismissed

The temporal gap between Plaintiff's December 12, 2000 protected activity and her termination demonstrates that there is no causal nexus. Villiarimo is instructive in this matter. In Villiarimo, the plaintiff filed a wage and hours complaint in July 1997. Villiarimo, 281 F.3d at 1059-1060. Eighteen months later, Plaintiff was terminated for violations of company policy. Id. at 1059. The Ninth Circuit held that the eighteen month gap was too long to support an inference of causation and dismissed the plaintiff's termination claim. Id. at 1065.

This case is on point with Villiarimo as a gap of more than two years existed between Plaintiff's December 12, 2000 protected activity and her termination in March of 2003. Plaintiff cannot provide any probative evidence, that links the alleged adverse actions and her protected activity. As such, due to Plaintiff's failure to establish a causal nexus, her retaliation claim related to her termination must be dismissed.

25

Even assuming, <u>arguendo</u>, that Plaintiff established a prima facie case of retaliation, as noted above, Defendants have set forth legitimate, non-discriminatory reasons for her termination and there is no evidence to establish that the reasons for termination were pretext.

E.    Plaintiff Failed to Establish a Hostile Work
      <u>Environment</u>

To establish a prima facie case of a hostile working environment, she must prove that the offending conduct: (1) was unwelcome; (2) was based upon her protected characteristics; (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment; and (4) was imputable to her employer.  <u>Kang v. U. Lim America</u>, 296 F.3d 810, 817 (9th Cir. 2002).

The plaintiff must show that her work environment was both subjectively hostile and objectively hostile; that is, she must show that he or she perceived the work environment to be hostile and a reasonable person would perceive it to be hostile. <u>Dominguez-Curry v. Nevada Transportation Department</u>, 424 F.3d 1027, 1034 (9th Cir. 2005).  Conduct that is not "severe or pervasive enough to create an objectively hostile or abusive environment" from the perspective of a reasonable person is "beyond Title VII's purview" and not actionable.  <u>Kang</u>, 296 F.3d at 817.  The factors courts consider in making this severe or pervasive determination include "the frequency of the

26

discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23
(1993); Vasquez, 349 F.3d at 642.

The conduct must be extreme to amount to a change in the
terms and conditions of employment." Faragher v. City of Boca
Raton, 524 U.S. 775, 788 (1998). Title VII is not a general
civility code and simple teasing, offhand comments and isolated
incidents (unless extremely serious will not amount to
discriminatory changes in the terms and conditions of
employment). Id.

Surrell v. California Water Service, Co., 518 F.3d 1097 (9th
Cir. 2008) is instructive in this matter. In Surrell, the
plaintiff brought numerous employment claims, including a hostile
work environment claim, based on comments/incidents made during a
four year period. Id. at 1108. The comments surrounded the
speed of Plaintiff's work and comments in front of customers
regarding Plaintiff not performing certain aspects of her job and
not paying attention to her job. Id.

The Ninth Circuit ruled that Plaintiff did not establish a
prima facie case of hostile work environment because there was no
evidence that the comments were based on race. Id. The Court
noted that the comments were performance related and not severe

27

or pervasive enough to sustain a hostile work environment claim.

Similar to <u>Surrell</u>, Plaintiff cannot demonstrate that any of the alleged conduct by Hotel management was motivated by her national origin, sex, race or prior EEO activity, her harassment claim fails as a matter of law.  Rather, any comments, including constructive criticism received made by Hotel management, made to Plaintiff were solely related to their concerns regarding the quality and quantity of her work product.  It is clear that Hamlin managed her employees in a strict, hands on manner, irrespective of an employee's race, sex, nation origin, or prior EEO activity.  All employees, male or female, were assigned tasks by Hamlin and were corrected on the spot by Hamlin if their work was not deemed to be satisfactory.

Hamlin was not the only member of Hotel management to express concern over Plaintiff's work product.  Concerns regarding her work product were reflected in her evaluations from 1998, 1999 and 2000 and were issued by Lelis and Chai.  <u>See</u> Exhibit "B".

Further, comments made to Plaintiff were not severe enough to create a hostile working environment nor was there any evidence that these performance-related comments were based on Plaintiff's race, sex, national origin or prior EEO activity. Nor did the constructive criticisms offered by Hotel management to Plaintiff unreasonably interfere with Plaintiff's work duties.

28

Rather, the comments made to Plaintiff were made to help improve her work performance.

Based on the foregoing, Plaintiff's hostile work environment claim must be dismissed.

V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants urge the Court to enter summary judgment in favor of Defendants on all claims asserted by Plaintiff.

DATED:  September 3, 2008, at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

/s/ Edric M. Ching

By_____
   EDRIC M. CHING
   Assistant U.S. Attorney

Attorneys for Defendants

29