# Exhibit "H"

233

```
DEPARTMENT OF DEFENSE

CIVILIAN PESONNEL MANAGEMENT SERVICE

OFFICE OF COMPLAINT INVESTIGATIONS
```

| | |
|---|---|
| In the Matter of the ) | DA Docket Number: |
| Discrimination Complaint of: ) | ARHAWAII03APR001 |
| SAMUD IMAI, ) | |
|       Complainant, ) | |
|   vs. ) | |
| R. L. BROWNLEE, Acting ) | |
| Secretary of the Army ) | |

COPY

FACT FINDING CONFERENCE

VOLUME II

Taken at the Hale Koa Hotel, Executive Conference Room, 2055 Kalia Road, Honolulu, Hawai'i, commencing at 8:01 on February 18, 2004.

BEFORE: CYNTHIA SHIGEMASA, Complaints Investigator

REPORTED BY: HOLLY M. HACKETT, RPR/CSR #130
              Certified Shorthand Reporter

POWERS & ASSOCIATES (808) 536-2001

APR -8 2004

**Exhibit "H"**

1            THE INVESTIGATOR:  We're back on the record.
2   It's the 18th of February.  Mr. Lee, can I have you stand,
3   please, raise your right hand.  Do you swear or affirm that
4   the information you provide here will be completely
5   truthful?
6            THE WITNESS:  Yes.
7            THE INVESTIGATOR:  You may have a seat.
8                         JOHN K. LEE
9   being first duly sworn to tell the truth, the whole truth
10  and nothing but the truth, was examined and testified as
11  follows:
12                          EXAMINATION
13  BY THE INVESTIGATOR:
14       Q.   Could you state your name for the record,
15  please?
16       A.   John K. Lee.
17       Q.   Mr. Lee, did you have an opportunity to read
18  the Privacy Act Notice?
19       A.   I did.
20       Q.   Do you have any questions about that before we
21  begin?
22       A.   No questions.
23       Q.   Can you tell me what your current position is?
24       A.   Director of the Hale Koa Rooms Division.
25       Q.   Is that an F position?

```
 1       A.    I did not.
 2       Q.    Did any of your management officials ever tell
 3  you that they regarded her as being physically disabled?
 4       A.    Not to the best of my recollection.
 5       Q.    Did you see the CCTV tape that allegedly shows
 6  Ms. Imai with a laniard in her hand?
 7       A.    Yes.
 8       Q.    What do you remember watching and seeing and
 9  concluding?
10       A.    I remember seeing a laniard that very closely
11  resembled the master key, attached to the master key that
12  was missing on January the 5th.  I remember the color and
13  shape of the laniard sort of pigtailed and the color being
14  red.
15       Q.    Are you saying that it was clear to you
16  watching the tape that Ms. Imai had a red laniard in her
17  hand as opposed to, for example, a green laniard?
18       A.    I am saying that, yes.
19       Q.    Since I saw the tape --
20       A.    Yes.
21       Q.    -- and I also have pictures that were taken
22  from the tape -- the tape that you have, how could you
23  determine that it was red?
24       A.    Well, this to me is the color red.  I see red.
25       Q.    You see it kind of like a tone or tinge of a
```

```
 1   red color?
 2        A.    Yes.
 3        Q.    Did anyone interpret it for you?
 4        A.    No.
 5        Q.    Did you sit down with somebody who said to
 6   you, "This looks red" or you drew your own conclusions?
 7        A.    I drew my own conclusions.  I did review it
 8   with a group of other individuals, however.
 9        Q.    And who was there at the time?
10        A.    That would have been our chief of security.
11        Q.    His name?
12        A.    Will Doris.  And I believe our Executive
13   Assistant Manager Cheryl Apo was also present.
14        Q.    Now, while you were reviewing it or after
15   reviewing it did you discuss it?
16        A.    We did discuss it, yes.
17        Q.    Was it a consensus, then, that it was a red
18   laniard as opposed to some other color?
19        A.    I believe the consensus was that it was, in
20   fact, a red colored laniard.
21        Q.    Now, Ms. Imai testified that she did not take
22   the red laniard or the No. 2 master key.  She claims she was
23   holding a No. 41 key which is on a green laniard in the
24   tape.
25              Is it possible that Ms. Imai is correct and
```

1  she did not have the No. 2 master key and she's actually
2  holding the No. 41 key in her hand?
3      A.    In my mind I don't know how that would be
4  possible.
5      Q.    Why is that?
6      A.    Because the events were such that that green
7  laniard would have been in the possession at this particular
8  time when these films were made, of either Kathleen Hamlin
9  or Ms. Lelis.
10     Q.    How do you know that?
11     A.    Well, they were dashing about quite madly
12  trying to track down the red master key.  In order to access
13  some of the offices that they searched, they would have
14  needed the green laniard, the key attached to that laniard.
15     Q.    Okay.  Did you ever personally interview
16  Ms. Hamlin and Ms. Lelis or were you just reviewing
17  statements that were prepared by them?
18     A.    I was reviewing statements that were prepared
19  by them.
20     Q.    This is Ms. Imai's first offense.  Why did you
21  decide to terminate her as opposed to something else than
22  termination?
23     A.    We had considered the severity of the offense,
24  and what could have happened had the keys, that master key,
25  fallen into the wrong hands and the consequences of that

1  having happened.

2     Q.    So what could have happened?  Why was it a
3  severe problem?

4     A.    Well, the well-being and the security of every
5  guest in this hotel was jeopardized had that key fallen into
6  the wrong hands.  That individual could have accessed any of
7  the guest rooms up until such time as we were able to change
8  the locks.

9           The safety and security of the hotel guests,
10 of course, is very important.  Coupled with the effort to
11 try and save the hotel's reputation had those events
12 happened.

13    Q.    So you mentioned the severity of the offense,
14 what could have happened.  Did you consider anything else
15 when you decided to terminate her?

16    A.    No.

17    Q.    Now, you contend in your decision letter that
18 Ms. Imai took the key for her own personal gain and not for
19 the protection of the agency.  Can you explain your
20 conclusion that she took the key for personal gain?

21    A.    I think she had a desired outcome in mind.  I
22 think that outcome was the dismissal of her supervisor
23 Kathleen Hamlin.  It's my conclusion that she rationalized
24 that if the master key were missing that there would be
25 severe consequence to Mrs. Hamlin.  One of those

1    A.    Well, at the root of all three charges is the
2 element of trust. And we felt like Samud had betrayed trust
3 by doing what she did. And we were able to restore trust
4 and order to the swing shift by her dismissal.
5    Q.    One of the other charges in the termination
6 letter was the allegation that she lied. How did you weigh
7 that in conjunction with the specific charge of the taking
8 of the key, authorized possession of the key? Was it
9 equally severe to you?
10    A.    I don't remember.
11    Q.    Now, did you have any involvement in the
12 disciplinary actions that were taken against Ms. Hamlin and
13 Ms. Lelis as a result of this matter?
14    A.    Yes.
15    Q.    What involvement?
16    A.    Well, I pressed her first-line supervisors for
17 information about what they intended to do in terms of the
18 consequence both ladies would have to suffer. And sort of
19 was very adamant that something be done. Does that answer
20 your question?
21    Q.    It appears that Ms. Lelis took position of the
22 No. 41 key and did not sign out for it that evening on
23 January 5th. And Ms. Hamlin handled the No. 2 key when she
24 left it in the door. And they were only suspended for one
25 day.

1           In your opinion was there a significant
2   difference between Ms. Imai's conduct and actions and their
3   conduct and actions on January 5th to warrant such an
4   extreme difference in disciplinary actions?
5           A.    Yes, there was.
6           Q.    Can you explain that?
7           A.    Well, Lelis's behavior, her actions and
8   Hamlin's actions were careless, and basically did not follow
9   the policies and procedures that we established for handling
10  of keys.
11              In my mind Mrs. Imai's actions were
12  malicious.
13          Q.    Now, Ms. Nemoto proposed the termination and
14  you were the deciding official.  Did you consult with anyone
15  when you decided to terminate Ms. Imai?
16          A.    I think we had some preliminary discussions
17  with our legal folks.
18          Q.    Did you at any time meet or discuss this
19  matter with Ms. Hamlin or Ms. Lelis to get their input on
20  what they felt the disciplinary action should be regarding
21  Ms. Imai?
22          A.    No.
23          Q.    So is it correct to say Ms. Hamlin and Ms.
24  Lelis had no input whatsoever in your decision to terminate
25  Ms. Imai?

1           Number two, I asked Mrs. Yadao whether she
2   had opened these doors to these offices that Lelis and
3   Hamlin searched. And the response from Yadao was no, she
4   didn't.
5       Q.   At some point as you were reviewing the
6   evidence that was collected and arriving, trying to arrive
7   at a decision to terminate or not terminate, did you know
8   that Ms. Imai claimed she was holding that No. 41 key with
9   the green laniard that evening?
10      A.   No. I did not.
11      Q.   So you decided it was the red laniard and you
12  stuck with that up until you passed your decision. Did you
13  at any time consider Ms. Imai's race, national origin,
14  color, gender or age when you decided to terminate her?
15      A.   No.
16      Q.   Did you discriminate against Ms. Imai for any
17  reason?
18      A.   Not in my mind, no.
19      Q.   What do you know about Ms. Imai's earlier EEO
20  complaint?
21      A.   I know that Samud's earlier complaint was that
22  she was being treated unfairly and differently from other
23  housekeeping employees that Hamlin, Ms. Hamlin supervised.
24      Q.   Did you provide testimony when her earlier EEO
25  complaint was investigated?

```
 1        A.    Yes.
 2        Q.    Did you decide to terminate Ms. Imai because
 3   you wanted to punish her for filing her earlier EEO
 4   complaint?
 5        A.    No.
 6        Q.    Now, to your knowledge, is there any other
 7   custodial worker who was similarly situated with Ms. Imai,
 8   for example, took a key, a master key without permission,
 9   tried to dispose of it, was not terminated?
10        A.    No.
11        Q.    Have you terminated any other non-probationary
12   employees over the past three years?
13        A.    Yes.
14        Q.    How many do you recall?
15        A.    I want to say three or four.
16        Q.    What were the reasons for those terminations,
17   if you remember?
18        A.    They were -- well, various reasons.  Poor
19   attendance, deficient performance.  I think those were the
20   only reasons.
21        Q.    Are you generally the deciding official for
22   the removal actions involving non-probation employees?
23        A.    Generally, yes.
24        Q.    Is there some way that you determine how these
25   matters should be elevated to your level or not?  Or is it
```

```
 1   the building at the loading dock.  He was hoisting this
 2   dumpster into a compactor when he saw the key there in the
 3   compactororr.
 4        Q.   Now, this is a dumpster that's kind of fairly
 5   large, the large metal one that's on rollers and it goes up
 6   on kind of a little forklift kind of lifting mechanism?
 7        A.   Yes.
 8        Q.   Kind of lifts it up, tilt it two over.  Is
 9   that correct?
10        A.   Yes.
11        Q.   And that dumpster sits down quite a few feet
12   below the level of the dock and there's a rail all around
13   it, correct?
14        A.   No.  It actually sits fairly level.  The top
15   edge of that compactor sits fairly level with the dock.
16        Q.   I'm sorry.  There's -- how deep is the
17   dumpster?
18        A.   The compactor or the dumpster?
19        Q.   Let's start with the dumpster.  How high or
20   however you want to describe it?
21        A.   I believe it's a ten cubic inch dumpster so
22   I'd say it's probably five and a half to six feet deep.
23        Q.   It sort of picks it up and turned over and
24   dumped down -- the compactor is a bin, right?  Dumps into
25   the bin, then it gets compacted into the main body of the
```

1  compactor, correct?
2     A.    The compactor and the large bin are one
3  complete unit.
4     Q.    Right.
5     A.    They're one and the same.
6     Q.    What I'm saying is when you look down if
7  there's nothing in the dumpster it's down quite a number of
8  feet from the level of the walkway, correct?  There has to
9  be a place that the stuff goes into.  It's like a bin?
10    A.    You and I are using different terms.  I call
11 the 10 cubic receptacle the dumpster.  I'm calling the
12 larger unit the compactor.
13    Q.    Okay.  The compactor is a bin that holds the
14 trash that the dumpster dumps into it?
15    A.    Yes.
16    Q.    It will hold more than one dumpster load?
17    A.    Yes.
18    Q.    So what I'm asking you is not the area, the
19 volume into which the dumpster is dumped also it's fairly
20 good size, right?
21    A.    Yes.
22    Q.    It sits down and the bottom of it is several
23 feet below the walkway where the dumpster is?
24    A.    Yes.
25    Q.    And when that dumpster is operating that kind

1           THE INVESTIGATOR:  If you're going to get
2   past the dumpster.  I've heard enough about the dumpster.
3   Ask your next question now.  I've heard enough testimony
4   from Mr. Lee.
5           Q.   (By Mr. Smith)   Have there been other instance
6   in which master keys have been missing or lost?
7           A.   I believe there was one other incident where a
8   master key or a key of some significance was misplaced.
9           Q.   And who misplaced that?
10          A.   I don't recall.
11          Q.   What happened to that individual?
12          A.   I don't remember.
13          Q.   How long ago was that?
14          A.   I don't remember that either.
15          Q.   Well, who would -- I mean how do you know
16   about it?
17          A.   Any time a master key is lost it's quite a
18   significant event.
19          Q.   So who would know about it if you don't?
20   You're the number two guy.
21          A.   I guess perhaps the Security Department would
22   know about it.
23          Q.   If you're the person who takes adverse actions
24   against employees, wouldn't you have been involved in taking
25   the action against --

1    A.    Not if it didn't involve a Rooms Department
2 employee.
3    Q.    So to your knowledge it didn't involve a Rooms
4 Department employee?
5    A.    To my knowledge that's correct.
6    Q.    It's a significant matter.  You would know if
7 it was a Rooms Department employee, wouldn't you?
8    A.    Yes.
9         MR. SMITH:  Okay.  That's all question I have.
10        THE INVESTIGATOR:  Thank you very much,
11 Mr. Lee.
12        THE WITNESS:  You're welcome.
13        MR. SMITH:  You got my e-mail last week,
14 right, on Marias?
15        MS. MacMURRAY:  Yes.
16        MR. SMITH:  Okay.  So I sent you another
17 e-mail about the times for that.  I'll be making an
18 extension for time.
19        THE INVESTIGATOR:  Ms. Imai, management has
20 denied -- we're still on the record, if you don't mind --
21 management has denied discriminating against you and has
22 offered reasons for its actions.
23     Accordingly you now have an opportunity to show that
24 the testimony that you have heard is a pretext to cover up
25 discriminatory conduct.  And if you prefer you may do that

```
 1   through the assistance of your attorney, Mr. Smith.
 2              MR. SMITH:  Thank you.  We will do that.
 3              THE INVESTIGATOR:  Okay.  Then I'd like a
 4   written pretext testimony in my office by the 25th of
 5   February.  Ms. MacMurray, would you like to make a closing
 6   statement?
 7              MS. MacMURRAY:  No, not at this time.
 8              THE INVESTIGATOR:  Mr. Smith, closing
 9   statement?
10              MR. SMITH:  No, thank you.  Bye.  Gotta go.
11              THE INVESTIGATOR:  Mr. Smith has abruptly and
12   rudely left the --
13              MR. SMITH:  I'm sorry.  I have another
14   appointment.
15              THE INVESTIGATOR:  I will continue with what
16   I was going to say --
17              MR. SMITH:  I'm sorry to be rude.  I have to
18   leave.
19              THE INVESTIGATOR:  -- on the record.
20              MR. SMITH:  You guys can stay if you like.
21              (Whereupon Mr. Smith, Mr. and Mrs.
22              Imai leave the room.)
23              THE INVESTIGATOR:  I was going to ask
24   Ms. Imai if it ws still her testimony after listening to all
25   the evidence that she was still subjected to discrimination,
```

1  but Ms. Imai has left the room with Mr. Smith.  And it looks
2  like her husband is also leaving the room before I've had an
3  opportunity to close the record.
4      Management, is it still your position that the actions
5  under review are free of any form of discrimination?
6          MS. MacMURRAY:  Yes, they are.
7          THE INVESTIGATOR:  Ms. Imai has returned to
8  the room with her husband. Ms. Imai, do you have any new,
9  meaningful suggestions toward resolution of the complaint?
10         MS. IMAI:  We will talk to our attorney
11 first.
12         THE INVESTIGATOR:  Okay.  Ms. Imai said she
13 wants to talk to her attorney first.  I'd need some
14 additional documents.  I'd like to get that on the record.
15 The second page of the performance appraisal that the agency
16 representative made reference to during the questioning.
17         MS. MacMURRAY:  It's a couple pages.
18         THE INVESTIGATOR:  I'd like a copy of that.
19 A picture of the No. 2, No. 35, No. 41 key side by side.
20 Would it be possible to get that?
21         MS. MacMURRAY:  Yes.
22         THE INVESTIGATOR:  During your questioning
23 you brought up the chronology of events that Ms. Imai
24 prepared during the early investigation of another complaint
25 that she filed.  There was a portion there you said that

1  from March 2001 to March 2002 she believed Ms. Hamlin's
2  behavior had changed.  She no longer felt she was being
3  treated differently.  You brought that up when you were
4  questioning one of the witnesses.  If I could have a copy of
5  that.
6      I was provided with a copy of the CCTV tape for the
7  evening of January 5th but I'm not able to access it.  I'd
8  like to have a copy of the tape that I can access and
9  including a complaint file.
10     I'd like to have a copy of the disciplinary actions
11 that were taken against Ms. Hamlin and Ms. Lelis.
12     You also made reference to the collective bargaining
13 agreement.  I'd like to have that page that addresses who's
14 covered and disciplinary actions.
15     Because you mentioned it was a time constraint that
16 would explain why one action took place so much earlier than
17 the other actions, although they're all related.
18     And there was questions concerning the worksheet.  The
19 worksheet was never entered into the record.  This is the
20 worksheet that Ms. Imai prepared on January 5th that
21 Ms. Nemoto said she read to Ms. Imai on January 15th.  I'll
22 also need a copy of that.
23     Also since Mr. Smith questioned Mr. Lee at length about
24 the floor plan, had him draw his X's and numbers, then I'll
25 need a copy of that floor plan.

1    And I'd like to get these documents at the same time
2    that I've asked Mr. Smith on the record for his pretext
3    testimony.  That's by the 25th of February.
4    Okay.  And if the parties have nothing else to say at
5    this point or to add, then I thank you both for your
6    cooperation.  The conference is then closed at 9:25.  Thank
7    you very much.
8    (Proceedings concluded at 9:25 a.m.)
9    --ooo0oo--

```
 1                    C E R T I F I C A T E
 2
 3        I, HOLLY HACKETT, R.P.R., C.S.R. in and for the
 4   State of Hawai'i, do hereby certify;
 5        That I was acting as shorthand reporter in the
 6   foregoing matter on the 18th day of February, 2004
 7        That the proceedings were taken down in
 8   computerized machine shorthand by me and were thereafter
 9   reduced to print by me;
10        That the foregoing represents, to the best
11   of my ability, a correct transcript of the proceedings
12   had in the foregoing matter.
13        I further certify that I am not counsel for any of
14   the parties hereto, nor in any way interested in the outcome
15   of the cause named in the caption.
16   DATED:   This 29th day of February, 2004
17           Holly M. Hackett
             HOLLY M. HACKETT, R.P.R., C.S.R. #130
18           Certified Shorthand Reporter
```

POWERS & ASSOCIATES (808) 536-2001